UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KENNETH WALLACE,

               Petitioner,

    -vs-

THOMAS POOLE, SUPERINTENDENT
FIVE POINTS CORRECTIONAL FACILITY

             Respondent.

_____

**DECISION AND ORDER**
**No. 10-CV-00722(MAT)**

## I.   Introduction

Petitioner Kenneth Wallace ("Petitioner"), through counsel, has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered April 26, 2005, in New York State, Supreme Court, Monroe County (Hon. Elma A. Bellini), convicting him, after a jury trial, of Rape in the First Degree (N.Y. Penal Law ("Penal Law") § 130.35(1)), seven counts of Rape in the Third Degree (Penal Law § 130.25(2)), one count of Criminal Sexual Act in the Third Degree (Penal Law § 130.40(2)), and one count of Assault in the Second Degree (Penal Law § 120.05(2)).

For the reasons stated below, habeas relief is denied and the petition is dismissed.

## II.   Factual Background and Procedural History

### A.   Indictment

Petitioner was indicted by a Monroe County Grand Jury and charged with seven counts of Rape in the Third Degree, one count of Criminal Sexual Act in the Third Degree, one count of Rape in the First Degree, and one count of Assault in the Second Degree. The charges arose from various incidents that occurred from December 2002 through February 2004, in the City of Rochester, New York, wherein Petitioner engaged in sexual intercourse with F.G. ("F.G." or "the victim"), a girl under 17-years-old whom Petitioner had been raising as his daughter.  On May 15, 2004, after a physical altercation, Petitioner beat F.G., causing multiple injuries. Later that same night, Petitioner engaged in sexual intercourse with F.G. against her will.  <u>See</u> Ind. No. 1017, dated 11/16/04 at Resp't Ex. B.

On April 4, 2005, Petitioner proceeded to trial before the Hon. Elma A. Bellini and a jury.

### B.   The Trial

From a young age, F.G., who was 17-years-old at the time of the trial, had been raised by Petitioner whom she believed to be her biological father.  Trial Trans. [T.T.] 188-189, 280-282. F.G.'s biological father was murdered when F.G. was young.  F.G. was raised in Philadelphia by Petitioner and her biological mother, Daisy, and her three brothers, Jonathan, Shamel, and Shaiquwn.

T.T. 191.  At the time of the trial, Daisy had not been a part of F.G.'s life for several years.  T.T. 281.

In the fall of 2002, when F.G. was 15-years-old, Petitioner, F.G., Shamel, and Shaiquwn moved to Rochester, while Daisy remained in Philadelphia.  T.T. 193-194.  Temporarily, the four individuals moved in with Petitioner's brother, Nathaniel Wallace, at 264 Dr. Samuel McCree Way in Rochester.  T.T. 195-196, 324, 586-587. At that time, Petitioner was employed as a carpenter and a professional boxer.  T.T. 587-588.

At trial, F.G. testified to seven separate incidents in which Petitioner engaged in sexual intercourse with her after she moved to Rochester with Petitioner, but prior to her reaching her seventeenth birthday.  The first incident occurred around Christmas 2002, when the family was still living with Petitioner's brother. After the family had dinner, Petitioner took F.G. next door to the home at 262 Dr. Samuel McCree Way, which they intended to live in at some point.  T.T. 199-200, 204.  Petitioner locked the front door and placed blankets and cushions on the floor.  T.T. 200, 202-203.  He then pulled on F.G.'s clothes, and F.G. refused his advances.  T.T. 201.  Petitioner eventually took off his pants and put his penis in F.G.'s vagina.  T.T. 201-202.  Afterwards, F.G. did not tell anyone what had happened because Petitioner had told her "he was going to kill [her]" if she did.  T.T. 203.

F.G. also testified to two incidents of sexual intercourse with Petitioner that occurred in February 2003.  In one incident,

Petitioner came to F.G. as she was going to sleep in her bedroom. Petitioner took her into the living room and had sex with her on the living room couch.  T.T. 204-206.  Again, F.G. did not tell anyone because Petitioner had threatened to hurt her if she did. T.T. 207.

In mid-August 2003, the family moved into the home at 262 Dr. Samuel McCree Way.  T.T. 193, 207.  F.G. testified to two incidents that occurred at that location between September 1 and October 10, 2003 in which Petitioner had sex with her before she left for work.  T.T. 209-212.  Nobody was home at the time and the front doors were locked.  T.T. 210-212.  Her brothers were outside at the time.  T.T. 210.  F.G. did not tell anyone because Petitioner had threatened to hurt her.  Petitioner also told F.G. that if she stopped having sex with him, he would accuse her of having sex with another person.  T.T. 224.

On October 10, 2003, Petitioner married Vanessa Madden ("Madden"), with whom he had earlier had a son, Keith.  T.T. 192, 207-209, 326, 584-585, 644-648.  Shortly thereafter, Petitioner, F.G., Shamel, and Shaiquwn moved into Madden's home at 360 Hayward Avenue with her and her sons.[1]  T.T. 192, 214-215, 377-378, 587, 590, 674-675.

F.G. testified to another incident that occurred on or around November 21, 2003 after she moved into Madden's home.  T.T. 213-

---

[1]

Madden testified that she has five sons, but Petitioner is only the biological father of Keith.  T.T. 584.

217.   F.G. was taking a shower in the upstairs bathroom when Petitioner knocked on the door, came in, told F.G. to get out of the shower, and then engaged in sexual intercourse with her in the bathroom.   T.T. 216.   Petitioner also put his mouth on F.G.'s vagina.   T.T. 217.   Madden and F.G.'s brothers were home at this time, but Petitioner had locked the bathroom door.   T.T. 216-217.

F.G. testified to another incident that occurred in February 2004 when she was alone with Petitioner in the basement of Madden's home.   T.T. 218-220.   Petitioner had brought down his pit bull, which was non-violent to Petitioner but would attack others, to roam the basement.   T.T. 220.   After Petitioner came downstairs with the dog, Petitioner had sex with F.G. on a weight bench. While Petitioner and F.G. were in the basement together, no one came downstairs.   T.T. 223.

F.G. testified to another incident -- although she could not recall the date -- wherein Petitioner came into her bedroom, woke her up, and had sex with her on the couch in her room.   T.T. 227. F.G. testified that she could not recall the date this happened "[b]ecause it happened so often."   T.T. 227-228.   F.G. testified that Petitioner generally used condoms.   T.T. 269.

F.G. testified that she believed Petitioner's threats of physical harm were real because she had seen Petitioner hurt other people, including her uncle and her mother.   T.T. 213.   F.G. and Madden both testified to a 2004 incident in which Petitioner became so enraged during an argument he was having with Madden that he

choked her while telling her that he was going to kill her.  T.T. 259, 263, 594-595, 680-681, 689-691.

On May 15, 2004, Petitioner physically assaulted F.G. at Madden's home when, Petitioner discovered that F.G. had a cell phone, in defiance of his instructions.  Petitioner accused F.G. of sleeping with boys and hit F.G. with an open hand, knocking her down. He then grabbed her by the throat, lifted her up, and threw her on the ground.  T.T. 234-235.  Petitioner slapped, punched, and kicked F.G. while she was on the ground, dragged her by the hair, called her names, and told her he would kill her.  T.T. 235-243, 334, 611-616.  At one point, Petitioner hit F.G. on the head with a wooden board that had broken off of F.G.'s dresser.  T.T. 240. Madden eventually interceded and rinsed F.G.'s head with peroxide to clean the wound, but F.G. was not otherwise treated for her injuries.  T.T. 238, 241-245, 258, 613-618, 682-684.  F.G. suffered bleeding to her head, a bloody nose, a cut lip, a scratched back, and injuries to her right index finger and ankle.  T.T. 240, 254, 334-340, 614, 617-618.

Later that same night, after the family had gone upstairs to bed, Petitioner forced F.G. to have sex with him on a downstairs couch.  T.T. 247-250.  F.G. was in pain and told Petitioner to stop, but he continued.  F.G. was afraid to scream because she thought Petitioner would hurt her again.  T.T. 248-252, 256.

Because of her injuries, F.G. was absent from school for two and one-half weeks.  School authorities were told that she was

absent because of a death in the family and then an illness.  T.T. 254-255, 452-454, 461, 621-622, 684.  Upon returning to school, F.G. did not initially tell anyone about the assault because she was afraid of Petitioner.  T.T. 263-264, 362-364, 431-433.  In June 2004, F.G. told a friend from school about the physical assault.  T.T. 264-265, 364, 476-478.  F.G. and the friend later told the school guidance counselor about the physical abuse, who then reported the abuse to the principal, who referred the matter to Child Protective Services ("CPS").  T.T. 266, 364-365, 461-467, 479-482, 485.

A CPS Investigator came to the school and spoke with F.G. T.T. 267, 381-382.  On June 9, 2004, F.G. was taken to Rochester General Hospital where she was examined.  T.T. 267.  The examination showed no fractures, but she had a small laceration on the top of her head that was healing, and there was swelling on her right index finger and on the top of her right foot.  T.T. 172-173, 180, 268, 490-496, 500-503.  While she was at the hospital, F.G. gave a statement to police, reporting the physical abuse but not the sexual abuse.  Petitioner was arrested and F.G., along with her brothers, was immediately placed in foster care where she remained through the time of the trial.  T.T. 170-171, 177-179, 182-183, 268-269, 284-285, 338-344, 347, 366-367, 426-427, 684, 692.

Eventually, while F.G. was in foster care, she told a CPS worker about Petitioner's sexual abuse.  T.T. 269, 373-374, 429.

F.G. then met with the police and signed a sworn statement describing the sexual abuse.  T.T. 378-379.

F.G. and Madden both testified that a few days after the May 15, 2004 assault, but prior to F.G.'s first statement to police on June 9, 2004, Madden told F.G. that Petitioner was not her biological father.  T.T. 190, 593-594.  F.G. received official confirmation of this fact from papers she received while she was in foster care.  T.T. 189-191.  F.G. testified that she received these papers around the time she first reported the sexual abuse.  T.T. 383-384, 386, 390.  She testified that she felt betrayed and hurt by this information.  T.T. 386, 388.  She testified, however, that learning that Petitioner was not her biological father had nothing to do with her decision to report the rapes to the police.  T.T. 436-437.

F.G. maintained contact with Petitioner after she entered foster care.  T.T. 369-370.  In the end of June 2004, F.G. gave Petitioner a Father's Day gift.  T.T. 371-372.  F.G. and Petitioner had one supervised visit in the summer of 2004.  She also called Petitioner on his birthday, September 30, 2004, to tell him that she loved him.  T.T. 271-272, 370, 424.  She testified that, despite everything he had done, he was a father in her life and she still cared for him and wanted to wish him a happy birthday.  T.T. 272.

Although Madden did not witness any sexual encounters between F.G. and Petitioner, she testified on behalf of the prosecution and corroborated much of F.G.'s testimony.  T.T. 582-652.

The prosecution presented the testimony of Pamela Herendeen ("Herendeen"), a pediatric nurse practitioner, as an expert in child sexual abuse.  T.T. 514-517.  She testified that children and adolescents "heal very quickly," such that any physical signs of sexual abuse will clear up within days of abuse.  T.T. 517-520. She also testified that, in her experience, child sexual abuse victims do not "promptly disclose" the abuse.  As a result, only about five percent of child sexual abuse victims show physical signs of abuse.  T.T. 518-520.  She testified that by the time most abuse victims disclose the abuse, weeks or months later, "everything is healed."  T.T. 520.  Because F.G. was an "older teenager," she was "fully developed and there wouldn't be any trauma from any kind of ongoing sexual activity."  T.T. 523. Herendeen also testified that it is a myth that a girl's hymen is broken by sexual activity, and that "there is no way to look at a 17-year-old's vagina and be able to tell whether or not she had been penetrated."  T.T. 523-524.

The prosecution also presented the testimony of Stefan Perkowski ("Perkowski"), a licensed social worker, as "an expert in the field of child sexual abuse" and, specifically, the Child Sexual Abuse Accommodation Syndrome ("CSAAS").  T.T. 529-536. According to this theory, sexual abusers "use various types of

inducements or pressures to keep the youngsters from revealing" the abuse, including physical violence, threats, and convincing the child that the abuse is normal.  T.T. 540-543.  Morever, abused children will "psychologically adapt to what they're experiencing," manifesting a broad range of behaviors.  T.T. 543-545.  A victim will often want continued contact with the abuser, blaming herself and exonerating the abuser.  T.T. 545-546.

Perkowski also testified that children do not often "promptly" disclose the abuse.  Rather, "[d]elayed disclosure is far and away the most prevalent common experience."  T.T. 548-550.  According to Perkowski, children often disclose the abuse in increments rather than all at once, and that, in his experience, false reporting of abuse is extremely rare.  T.T. 577.

**C.   Verdict and Sentencing**

At the close of the trial, Petitioner was found guilty as charged.  He was subsequently sentenced to a determinate term of twenty-five years imprisonment for Rape in the First Degree, a concurrent two-year determinate term for Assault in the Second Degree, and concurrent one- to three-year terms on each of the remaining counts, along with five years of post-release supervision.  T.T. 862-865; Sentencing Mins. [S.M.] 27-30.

**D.   Direct Appeal**

Through counsel, Petitioner appealed his judgment of conviction on the following grounds: (1) in violation of the Confrontation Clause and in an abuse of discretion, the trial court

-10-

curtailed cross-examination of Petitioner's wife regarding her bad check arrest and her motive to fabricate, and of F.G. regarding her poem to her father; (2) ineffective assistance of trial counsel; (3) the demeanor of the trial judge denied Petitioner a fair trial; (4) Petitioner's conviction was the result of cumulative error; and (5) harsh and excessive sentence. See Resp't Ex. A.

Petitioner also submitted a *pro se* supplemental appellate brief in which he argued that (1) the trial court erred by admitting the testimony of nurse Herendeen; (2) trial counsel rendered ineffective assistance; and (3) the trial court impermissibly submitted certain exhibits to the jury. See Resp't Ex. D.

The Appellate Division, Fourth Department unanimously affirmed the judgment of conviction on March 20, 2009, and leave to appeal was denied. People v. Wallace, 60 A.D.3d 1268 (4th Dep't 2009) (Resp't Ex. F); lv. denied, 12 N.Y.3d 922 (2009) (Resp't Ex. H).

### E.   Petitioner's Motion to Vacate

On or about October 23, 2008, Petitioner filed a *pro se* motion, pursuant to N.Y. Crim. Proc. Law ("C.P.L.") § 440.10, to vacate his judgment of conviction on the following grounds: (1) ineffective assistance of trial counsel; and (2) the trial court improperly responded to a jury note. See Resp't Ex. I. The Monroe County Supreme Court denied the motion on state procedural grounds pursuant to C.P.L. § 440.10(2)(c) and (3)(b). See Resp't Ex. M.

Petitioner, acting *pro se*, applied for leave to appeal the denial of his motion in the Appellate Division, Fourth Department. See Resp't Ex. N.  In a letter dated May 27, 2009, the Appellate Division, Fourth Department returned Petitioner's application because "it [did] not include all necessary papers," and directed Petitioner, among other things, to submit to the court an original and one copy of his leave application.  See Resp't Ex. G.  On or about June 6, 2009, Petitioner filed a motion for an extension of time to file his leave application, asserting that the "instant [leave] application should be granted and the enclosed criminal leave application deemed properly filed."  Resp't Ex. P at 5.  On August 20, 2009, the Appellate Division, Fourth Department denied Petitioner's motion.  See Resp't Ex. Q.

## F.   The Habeas Corpus Petition

Through counsel, Petitioner filed the instant habeas corpus petition, wherein he seeks relief on the following grounds: (1) ineffective assistance of trial counsel; and (2) that Petitioner's Confrontation Clause rights were violated by the trial court's ruling precluding Petitioner from cross-examining Madden with respect to a child custody petition that she filed against Petitioner in Family Court.[2]  See Pet. ¶ 12 (Dkt. No. 1); Pet'r

---

[2]

In conjunction with this claim, Petitioner also alleges that the Appellate Division, Fourth Department erred by finding that the preclusion of cross-examination regarding F.G.'s poem to Petitioner and Madden's arrest for passing a bad check was harmless error.  See Pet'r. Mem., Point III.  In his counseled Reply, however, Petitioner concedes that the claim is unexhausted and therefore wishes to withdraw it from the habeas corpus petition.  See Pet'r Reply at 1. Accordingly, that claim is withdrawn, and the Court does not address it herein.

Mem. of Law ("Mem."), Points I-III (Dkt. No. 6); Pet'r Reply Mem. of Law ("Reply"), Points I-III (Dkt. No. 21).

## III. General Principles Applicable to Habeas Review

### A.    The AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2).  A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000).  The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state-court decision. Williams, 529 U.S. at 412; accord Sevencan v. Herbert, 342 F.3d 69, 73-74 (2d Cir. 2002), cert. denied, 540 U.S. 1197 (2004).

-13-

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413; see also id. at 408-10. "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001). Rather, "[t]he state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." Id. This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom. Parsad v. Fischer, 540 U.S. 1091 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the

state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

### B.   Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); <u>see, e.g.</u>, <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 843-44 (1999); <u>accord, e.g.</u>, <u>Bossett v. Walker</u>, 41 F.3d 825, 828 (2d Cir.1994), <u>cert. denied</u>, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." <u>Daye v. Attorney General</u>, 696 F.2d 186, 191 (2d Cir. 1982) (<em>en banc</em>), <u>cert. denied</u>, 464 U.S. 1048 (1984).

## IV.  Petitioner's Claims

## 1.   Ineffective Assistance of Trial Counsel

Petitioner argues that he received ineffective assistance of counsel because trial counsel: (1) allegedly failed to consult with, and to offer the testimony of, an expert in CSAAS to counter the prosecution's expert; and (2) allegedly failed to investigate and offer the testimony of two fact witnesses, Shamel (Petitioner's teenage son) and Daisy (the victim's mother). <u>See</u> Pet'r Mem. of

Law, Points II-III; Pet'r Reply, Points I-II.  As discussed below, these claims are meritless and provide no basis for habeas relief.[3]

"To establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.'" Premo v. Moore, 131 S. Ct. 733, 737-38 (2011) (quoting Knowles v. Mirzayance, 556 U.S. 111, ___, 129 S. Ct. 1411, 1413 (2009)).  "To establish deficient performance, a person challenging a conviction must show that 'counsels representation fell below an objective standard of reasonableness.'"  Harrington v. Richter, 131 S. Ct. 770, 787, (2011) (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)).  "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  Id. (quoting Strickland, 466 U.S. at 687).  "[T]here is no reason for a court deciding an ineffective assistance claim to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.

---

[3]

Initially, the Court notes that the parties do not dispute whether the former portion of the claim was properly exhausted in the state courts.  With respect to the latter portion of the claim, Respondent has raised exhaustion as a defense.  See Resp't Mem. at 18.  According to Respondent, Petitioner's failure to properly appeal the denial of his pro se motion to vacate renders it unexhausted and procedurally defaulted.  See Resp't Exs. N, O, P.  Although the latter portion of this claim is arguably unexhausted and subject to procedural default, the parties have addressed both portions of the claim, in the alternative, on the merits.  Accordingly, the Court declines to address the procedural issues pertaining to the latter portion of the claim, and, instead, resolves Petitioner's ineffective assistance of counsel claim, in its entirety, on the merits.

## A.    Failure to Consult With or Call an Expert in CSAAS

Petitioner argues that he received ineffective assistance of trial counsel because defense counsel allegedly failed to consult with and call an expert in CSAAS to counter the People's expert (Perkowski).  In particular, he contends that although Perkowski "ostensibly testified as a general expert regarding the spectrum of behaviors exhibited by victims of sexual abuse, his testimony in actuality explained many of the inconsistencies in the complainant's testimony, thus bolstering [the victim's] credibility."  Pet'r Mem. at 6.  Further, he contends that "trial counsel failed to present evidence that CSAAS is a controversial theory that lacks acceptance by the scientific community and fails to explain the behavior patterns of sexually abused children."  Pet'r Mem. at 7-8.

As Petitioner correctly points out in its papers, the Second Circuit has repeatedly instructed that, "[i]n sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel."  Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005) (citing cases);  see also Lindstadt v. Keane, 239 F.3d 191, 202 (2d Cir. 2001) (in sex abuse case, state court's conclusion that petitioner did not receive ineffective assistance was unreasonable where, inter alia, defense counsel did not consult or call medical expert to challenge prosecution's

medical expert); Pavel v. Hollins, 261 F.3d 210, 223-24 (2d Cir. 2001) (same); Eze v. Senkowski, 321 F.3d 110, 127-28 (2d Cir. 2003) (same).   Such an omission is especially probative of ineffectiveness "where the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA, or third party eyewitness testimony." Gersten, 426 F.3d at 607.   The Second Circuit has stated that because of the "particular importance of physical evidence in child sexual abuse cases that turn into credibility contests" and the vagaries of physical indicia of abuse, consultation with an expert is a crucial aspect of a defense attorney's obligation to perform reasonable investigations. Eze, 321 F.3d at 128.

In support of his claim, Petitioner draws the Court's attention, in particular, to Gersten, arguing that "[t]he parallels to [his] case are obvious and striking."   Pet'r Mem. at 12.   In Gersten, a case involving the sexual abuse of a minor where there was no physical evidence of abuse, the Second Circuit held that counsel's failure to call an expert to refute testimony about CSAAS constituted ineffective assistance of counsel.   In that case, the prosecution presented the testimony of a psychological expert who testified generally about CSAAS.   The prosecution's expert conceded that he could not offer any specific opinion regarding the victim, but that it was extremely rare that children lie about sexual

abuse.  Gersten, 46 F.3d at 597.  Gersten's defense counsel failed to present any expert testimony to refute the prosecution's expert, and engaged in limited cross-examination.  Id.

There are some similarities between Gersten and the instant case.  Like Gersten, the only direct evidence of sexual abuse was the testimony of the victim.  To the extent that Perkowski's testimony regarding CSAAS syndrome explained some of the inconsistencies in the victim's testimony, it was, much like Gersten, important to the prosecution's case.  The record does not reveal whether defense counsel consulted an expert in CSAAS to rebut Perkowski.

However, Gersten is distinguishable in several significant respects. Unlike the defendant's trial attorney in Gersten, who failed to educate himself sufficiently on the scientific issues relevant to the case and was thereby unable to mount an effective cross-examination of the prosecution's expert, Petitioner's counsel was familiar with Perkowski as an expert witness[4] and CSAAS theory and possessed a knowledge and understanding of the subject matter, which he used to thoroughly and extensively cross-examine Perkowski.  Because of his demonstrated familiarity with Perkowski and with the subject matter, the Court cannot find that it was unreasonable, as a matter of trial strategy, to refrain from

---

[4]

On cross-examination, defense counsel asked Perkowski the following question: "[y]ou did a trial with me couple years back?"  T.T. 560.  In response, Perkowski answered, "[c]ouple years back."  T.T. 560.

consulting with, or offering the testimony of an expert and, instead, rely entirely on cross-examination to attack Perkowski's credentials, CSAAS theory, and the theory's application to the instant case.

On cross-examination, counsel elicited that Perkowski was not a physician and did not have a doctorate, that he did not prescribe medicine, and that his primary job was not diagnosis, but rather administration and program development.   T.T.   553-55. Additionally, counsel adeptly elicited from Perkowski that he had testified two hundred times on behalf of the prosecution, but only three times on behalf of the defense.   T.T. 559-561.

Defense counsel also attacked the CSAAS theory itself by eliciting an acknowledgment from Perkowski that CSAAS was not listed in the Diagnostic and Statistic Manual of Mental Disorders, the major reference work for the diagnosis of psychiatric disorders; was only a "clinical opinion, . . . not a scientific instrument"; and, was a "theory . . . based upon Dr. Ronald Summit's studies" done in 1983.   T.T. 562-564.   Further, defense counsel was able to elicit a confirmation from Perkowski that CSAAS had been "misused by experts in court."[5]   T.T. 573.   Defense counsel also elicited from Perkowski that Dr. Summit, the founder

---

[5]

On re-direct, Perkwoski clarified that CSAAS had been misused by experts in court in Kentucky who had attempted to use the theory as a diagnostic tool. According to Perkowski, the experts who had misused the theory "went beyond the scope of what the range, what the purpose of [Dr. Summit's article] was, the purpose of his work.  They went way beyond it without sanction."  T.T. 574.

of the CSAAS theory, had conceded that there is no clinical method to distinguish valid and invalid claims of abuse.  T.T. 573.  And, defense counsel elicited that, given Perkowski's failure to interview the victim, Perkowski could not say "whether [the] syndrome [was] even applicable to this particular case."  T.T. 561-562.

Moreover, counsel reiterated his attacks on Perkowski in his closing summation, referring to Perkowksi as "[t]he hired expert . . . [t]he guy who gets paid for his travel time and how long he talks to you [the jury] . . . ."  T.T. 747.  Also in closing, defense counsel stated that "CSAAS acknowledges there is no clinical method to distinguish valid claims from those that should be treated as fantasy or deception,"  and suggested that Perkowski's "testimony did nothing to help you [the jury]."  T.T. 748.  Defense counsel also elaborated on the "hired gun" theme by explaining to the jury that "[t]hey [the prosecution] don't believe in their case.  They put someone up there [Perkowski] to try to tell you why you should believe something other than your good common sense."  T.T. 748.

In short, defense counsel's cross-examination effectively discredited Perkowski and cast doubt on the theory of CSAAS as a valid scientific theory.  Accordingly, the Court cannot find that defense counsel's decision to refrain from calling an expert, given the facts and circumstances, was objectively unreasonable.  Because

Petitioner has failed to meet the first prong of Strickland, the Court need not address the prejudice prong.  See Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) ("'[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.'" (alterations in original) (quoting Strickland, 466 U.S. at 697)).

The state court's adjudication of this claim did not contravene or unreasonably apply settled Supreme Court law.  This portion of Petitioner's ineffective assistance of counsel claim is meritless and is dismissed.

**B.   Failure to Interview and Call Fact Witnesses**

Petitioner contends that trial counsel was ineffective because he failed to investigate and call Shamel and Daisy as fact witnesses.  According to Petitioner, these witnesses would have provided exculpatory testimony and challenged the credibility of F.G.  See Pet'r Mem., Point II; Pet'r Reply at 16-17.

It is well-settled that "[t]he decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess."  Laurey v. Graham, 596 F. Supp. 2d 743, 750 (W.D.N.Y. 2009)(quoting United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998)); see Strickland, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are

virtually unchallengeable"); <u>United States v. Nersesian</u>, 824 F.2d 1294, 1321 (2d Cir. 1987)("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."), <u>cert. denied</u>, 484 U.S. 958 (1987); <u>United States v. Schmidt</u>, 105 F.3d 82, 90 (2d Cir.1997) ("[T]he tactical decision of whether to call specific witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in professional representation."), <u>cert. denied</u>, 522 U.S. 846 (1997).

Here, the record reflects that counsel included Shamel (Petitioner's teenage son) and Daisy (the victim's biological mother) on his witness list, such that it is reasonable to assume that counsel interviewed both of them. T.T. 3-4, 50-51; <u>see</u> <u>Hogan v. Ercole</u>, 05-CV-5860 (RRM), 2011 U.S. Dist. LEXIS 98851, *46 (E.D.N.Y. Sept. 2, 2011) ("The fact that the three witnesses at issue were on defense counsel's witness list, but he declined to call them to the stand, speaks also [to] the fact that this does not constitute a simple case of lack of investigation or diligence by counsel, but rather that these choices constituted tactical decision that ordinarily do not constitute a claim of ineffective assistance of counsel.") (internal citations and quotations omitted).  To rebut this assumption, Petitioner points to the affidavits of Shamel and Daisy, which were originally annexed to

Petitioner's C.P.L. § 440.10 motion.  The Shamel affidavit, which appears to have been signed and notarized on November 29, 2007 (long after the conclusion of the trial), claims that "he was present on the date of May 15, 2004 that my sister claims these allegations happen to her, they are totally false.  I herd and saw everything that happen on that particular night," and that when he was in foster care with F.G., she indicated to him she had been untruthful.  Shamel's affidavit also claims that he wanted to testify at trial, but was never contacted by Petitioner's attorney. See Resp't Ex. I (Ex. B).  The Daisy affidavit, which is dated November 21, 2005, claims that the victim spoke to Daisy "[o]n 11/04." According to Daisy, on an unspecified day, F.G. indicated to Daisy that "she did not know how she was going to inform everyone that everything she had stated to those people was a lie." Daisy's affidavit does not state whether counsel interviewed her. See Resp't Ex. I (Ex. C).

    The Court finds that these affidavits are of questionable value in both form and substance and do little, if anything, to support Petitioner's claim.  Initially, both of the affidavits, which were obtained from familial relations of Petitioner (as opposed to unbiased parties), are dated long after Petitioner's trial concluded.  Further, Daisy's affidavit, although dated November 21, 2005, was not notarized until March 10, 2006. Daisy's affidavit does not assert that counsel did not interview her; in

fact, her affidavit makes no mention whatsoever of whether counsel interviewed her. Moreover, the proffered testimony about the statements allegedly made by the victim to the witnesses, in both instances, is vague and unsupported by specific details. See Resp't Ex. I at Exs. B, C.

Given the fact that counsel placed Shamel and Daisy on his witness list, it is likely, as Respondent points out, that counsel spoke with both individuals prior to trial, but that neither witness claimed, at the time, that F.G. had admitted to fabricating the charges. Or, counsel may have spoken to the witnesses and determined that they were not telling the truth. See Resp't Mem. at 49. In either event, counsel chose not to proffer their testimony and subject them to the dangers of cross-examination, especially given their interest -- as familial relations of Petitioner -- in having Petitioner exonerated. See Samuels v. Bennett, 03 Civ. 2340(BSJ)(FM), 2009 U.S. Dist. LEXIS 77357, *48 (S.D.N.Y. Aug. 17, 2009) (denying ineffectiveness claim where counsel failed to call alibi witnesses whose "familial relationship" with the defendant "would detract from their testimony and actually hurt [the defendant's] overall defense."), report and rec. adopted by, 2009 U.S. Dist. LEXIS 72645 (S.D.N.Y. Aug. 17, 2009). Under these circumstances, counsel did not unreasonably decide that offering the testimony of Shamel and Daisy might backfire. Accordingly, Petitioner has failed to demonstrate

that his attorney's performance was constitutionally deficient within the meaning <u>Strickland</u>.  Because Petitioner cannot make a successful showing of constitutionally deficient performance under the first prong of <u>Strickland</u>, the Court need not consider the prejudice prong.  <u>See</u> <u>Greiner</u>, 417 F.3d at 319.  Accordingly, this portion of Petitioner's ineffective assistance of counsel claim is meritless.    In  sum,  Petitioner's  ineffective assistance of counsel claim provides no basis for habeas relief.  The claim is therefore dismissed in its entirety.

**2.  Confrontation Clause Violation**

Petitioner argues that his Confrontation Clause rights where violated when the trial court precluded him from cross-examining Madden with respect to a child custody petition that she filed against him in Family Court with respect to their son, Keith.  <u>See</u> Pet'r Mem., Point III.    According to Petitioner, the trial court's preclusion of this cross-examination prevented him from questioning Madden about her motive to fabricate.  Pet'r Mem. at 24.  The Appellate Division, Fourth Department rejected this claim on the merits.  <u>Wallace</u>, 60 A.D.3d at 1269.  This claim is meritless and provides no basis for habeas relief.

Although a defendant's Sixth Amendment right to confront witnesses is guaranteed in both federal and state criminal proceedings, the right to cross-examination is not absolute.  <u>See</u> <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678-79 (1986) (citations

omitted).  "[T]he right to confront and cross examine witnesses is tempered by a trial judge's 'wide latitude' to impose 'reasonable limits' in order to avoid matters that are confusing or of marginal relevance." United States v. Stewart, 433 F.3d 273, 311 (2d Cir. 2006) (quotation omitted).  Moreover, the trial court may limit cross-examination "'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" Young v. McGinnis, 411 F. Supp. 2d 278, 302 (E.D.N.Y. 2006) (quotation and other citations omitted).

"Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (citation omitted).  A court does not improperly curtail cross-examination if "the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." United States v. Roldan-Zapata, 916 F.2d 795, 806 (2d Cir. 1990) (citation omitted); see also Howard v. Walker, 406 F.3d 114, 129 (2d Cir. 2005) (quotation omitted).

Here, the trial court properly exercised its discretion in precluding Petitioner from cross-examining Madden with respect to a child custody petition that she filed against him in Family Court with respect to their son, Keith.  The record reflects that prior

to jury selection, defense counsel asked the trial court to preclude cross-examination of certain "matters pending before Family Court."  T.T. 10.  In response, the trial court judge stated, "I'm not going to allow you [defense counsel] to make inquiry regarding ongoing proceedings per se," but if "there is a question that becomes relevant . . . if there is no legal reason to keep it out, I will have to make that ruling at that time.  I can't preguess every question [the prosecutor] is going to ask.  But I will allow you to ask about specific Family Court proceedings." T.T. 11-12.

Later, defense counsel sought to cross-examine Madden regarding the Family Court proceedings.  The trial court permitted defense counsel to ask Madden whether she was involved in "any type of matter where [she's] taking custody from" Petitioner of their son.  Madden responded in the negative.  T.T. 662.  Defense counsel then sought to question Madden further about the Family Court proceedings, and the prosecutor objected.  The defense argued that such proceedings would show that Madden had a "motive to lie against" Petitioner because she might lose custody "if [Petitioner] was not convicted of [the instant criminal] charges."  T.T. 662-664.  The trial judge who, as Petitioner notes, "was also in charge of [Madden's] family court proceeding" (see Dec. at ¶ 10), sustained the objection, finding that Petitioner's argument had "very little basis" because "if [Petitioner] was not convicted,

they [Petitioner and Madden] could reunite," such that the Family Court proceeding did not go to Madden's "motive or bias or reason to lie."  T.T. 664.  The court later expanded upon its ruling, determining that, although Petitioner could ask Madden about her fear of losing custody of Keith, the court was "not going to allow [the defense] to talk about those pending cases, particularly because [the court was] well aware that they weren't brought by [Madden], and she is being forced by [the Department of Social Services] to do certain things she doesn't want to."  T.T. 666-667.

Subsequently, the court permitted defense counsel to cross-examine Madden regarding her "problems with aggression with regard to [her] children," but sustained an objection when Petitioner inquired as to Madden's history with Child Protective Services. T.T. 670-671.  When asked for an offer of proof, defense counsel stated that the questioning "[g]oes to her caretaking abilities and her motive to fabricate to keep custody of Keith," and that Petitioner had "a right to go into reasons why she may or may not want to have an investigation occur at the house."  The court sustained the objection on the basis that the inquiry was without basis and irrelevant.  T.T. 670-673, 716-721.

Where a defense counsel fails to offer a good-faith basis for particular cross-examination questions, as is the case here, the trial court may properly exclude such questions to avoid undue prejudice. See e.g., People v. Wheatley, 211 A.D.2d 572, 572 (1st

Dep't 1995); <u>accord</u> <u>United States v. Concepcion</u>, 983 F.2d 369, 391-392 (2d Cir. 1992) ("The trial court may, in its discretion, preclude questions for which the questioner cannot show a good faith basis."). Moreover, the trial court may preclude repetitive, confusing, or irrelevant cross-examination. <u>See</u> <u>Van Arsdall</u>, 475 U.S. at 679. As both Petitioner and Respondent have pointed out in their respective papers (and the trial court acknowledged on the record), the trial court also presided over the Family Court proceedings at issue. In this respect, the trial court was well-situated to evaluate whether defense counsel's line of questioning was being made in good faith. After giving defense counsel an opportunity to explain his position, the trial court did not unreasonably determine that the inquiry lacked a good-faith basis.

Moreover, despite the trial court's ruling curtailing cross-examination of Madden with respect to the Family Court proceedings, Petitioner was permitted to cross-examine Madden with respect to the custody of her children, her general caretaking/parenting abilities, and her suspicions that Petitioner was cheating her on her. Trial counsel thus was able to elicited facts from Madden so to enable the jury was able to assess her credibility. <u>See e.g.</u>, <u>Valentine v. Savage</u>, No. 09-CV-0887T, 2011 U.S. Dist. LEXIS 109710, *16 (W.D.N.Y. Sept. 27, 2011) ("Under these circumstances, where the trial court permitted defense counsel to expose the jury to facts sufficient to evaluate [the witness's] credibility -- albeit

not in the precise manner in which [Petitioner] may have wished --
Petitioner's right to confront [the witness] was not violated."); 
see also Drake v. Woods, 547 F. Supp. 2d 253, 265, 266-267
(S.D.N.Y. 2008) (no Confrontation Clause violations where jury was
in position to make discriminating appraisal of credibility of two
witnesses despite trial court's evidentiary rulings).  In
particular, defense counsel was permitted to ask Madden whether she
was afraid that her children would be taken away from her, and
whether she was involved in "any type of matter where you're taking
custody from" Petitioner of Keith.  In both instances, she
responded in the negative.  T.T. 662, 671.  Defense counsel was
also permitted to ask a series of questions crafted to establish
that Madden was a jealous woman, although she repeatedly denied the
allegations.  T.T. 675-676.  Further, defense counsel successfully
elicited that Madden had made a number of decisions, manifesting
poor judgment, in order to keep Petitioner happy, including not
calling the police after the beating of F.G. on May 15, 2004;
leaving Petitioner alone with F.G. after the beating; lying to the
school as to why F.G. was absent following the beating; and not
telling the police the truth on June 9, 2004, when the police came
to her home and asked her questions.  T.T. 681-688.

Because trial courts have "considerable leeway" in making
evidentiary decisions, and because "the type of evidentiary ruling
challenged in this case is afforded wide latitude by the
Constitution," Watson v. Greene, 640 F.3d 501, 512 (2d Cir. 2011)

(quotation and citation omitted), the Court cannot conclude that "the trial court so clearly abused its discretion that the state appellate court's failure to find an abuse of discretion was an unreasonable application of clearly established federal law[,]" id. (citation omitted). The state court's adjudication of this claim was not contrary to, and did not unreasonably apply, settled Supreme Court law. Therefore, habeas relief is unwarranted and the claim is dismissed in its entirety.

## V.   Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with

United States Court of Appeals for the Second Circuit in accordance
with the requirements of Rule 24 of the Federal Rules of Appellate
Procedure.

      **IT IS SO ORDERED.**


                                        S/Michael A. Telesca

                                  _____

                                  HONORABLE MICHAEL A. TELESCA
                                  United States District Judge

DATED:       December 20, 2011
               Rochester, New York